USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 2 3 2020

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------- x

GALVSTAR HOLDINGS, LLC; DSB HOLDINGS, LLC,
*as assignee*,

                           Plaintiffs,

                MEMORANDUM DECISION
   -against-                      AND ORDER

HARVARD STEEL SALES, LLC; JEREMY JACOBS,   16 Civ. 7126 (GBD) (BCM)

                          Defendants.

------------------------------------- x

GEORGE B. DANIELS, United States District Judge:

Plaintiffs Galvstar Holdings, LLC ("Galvstar") and DSB Holdings, LLC ("DSB"), the assignee of all rights, title, and interest in Galvstar's non-plant and equipment assets, including any potential causes of action, brought this action against Defendants Harvard Steel Sales, LLC ("Harvard") and Jeremy Jacobs ("Jacobs"). (Notice of Removal, Ex. A ("Am. Compl."), ECF No. 1 at 6.)[1] Plaintiffs originally brought claims against Defendant Harvard for (1) breach of a joint venture agreement, (2) breach of contract, and (3) breach of the covenant of good faith and fair dealing. (*Id.* ¶¶ 103–111, 122–136.) They also brought claims against both Defendants for (1) breach of fiduciary duty and (2) fraud. (*Id.* ¶¶ 112–121, 137–144.)

---

[1] Galvstar is a steel processing company founded by Daniel Bain ("Bain"). (*Id.* ¶ 1.) "Three years after Galvstar ceased operations, Bain assigned Galvstar's remaining assets to DSB pursuant to an 'Assignment of Assets' dated August 10, 2016." (*see* Def. Harvard Steel Sales, LLC's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Harvard's Rule 56.1 Statement"), ECF No. 91-2 at ¶ 99; *see also* Mem. in Opp'n, Ex. 1 (Pl. DSB Holdings, LLC's Opp'n to Def. Harvard Steel Sales, LLC's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 and Pl.'s Counter-Statement of Material Facts Not in Dispute) ("Opp'n to Rule 56.1 Statement"), ECF No. 97-1 ¶ 99.) In an amendment to this Assignment, Bain specified that the assignment covered any of Galvstar's claims and causes of action. (Harvard's Rule 56.1 Statement ¶ 100; *see also* Opp'n to Rule 56.1 Statement ¶ 100.) Harvard is a steel distributor and former customer of Galvstar. (Am. Compl. ¶ 17.) Jacobs is the president of Harvard. (*Id.*)

On November 18, 2016, Defendants moved to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Mot. to Dismiss, ECF No. 12.) This Court granted that motion on April 20, 2017, (Mem. Decision and Order, ECF No. 21 (the "2017 Decision")), and DSB, as assignee, appealed that decision to the Second Circuit Court of Appeals, (*see* Notice of Appeal, ECF No. 22). The Second Circuit affirmed this Court's dismissal of all claims, except it vacated and remanded this Court's dismissal of the claim for breach of the implied covenant of good faith and fair dealing. (Summ. Order, ECF No. 24.)

Harvard subsequently moved for summary judgment, arguing that (1) the record contains no support for the claim that it breached the implied covenant of good faith and fair dealing and (2) DSB has no standing because the lawsuit violates New York's laws against champerty. (*See* Notice of Mot. and Def. Harvard Steel Sales LLC's Mot. for Summ. J., Ex. 1 (Def. Harvard Steel Sales, LLC's Opening Brief in Supp. of its Mot. for Summ. J. ("Mem. in Supp.")), ECF No. 91-1, at 18–22.) The relevant factual background is substantially set forth in this Court's prior decision on Defendants' motion to dismiss, (*see* 2017 Decision at 1–5), and is incorporated by reference herein. Harvard's motion for summary judgment is GRANTED.

## I. DSB'S ALLEGATIONS

In late 2012, Harvard began financing 100% of Galvstar's steel production. (Am. Compl., ¶ 32.) Subsequently, in February 2013, Bain and Jacobs agreed to the principal terms of a five-year Toll Processing Agreement ("TPA") between Galvstar and Harvard, which provided for Galvstar to apply a galvanized coating on Harvard-supplied steel coil. (*Id.* ¶¶ 35–36.) At this meeting, Jacobs and Bain agreed that Harvard would process a guaranteed amount of its steel orders through Galvstar in exchange for a 50% interest in the profits of Galvstar's plant. (*Id.* ¶ 3.)

On April 16, 2013, a machinery failure at the Galvstar plant caused the galvanizing line to shut down for eight days. The plant's production was not restored to full capacity until May 9, 2013.

2

(*Id.* ¶¶ 60–61.) On April 17, 2013, the day after the machinery failure, Timothy Pynchon ("Pynchon")—the representative of the owner of bonds issued by Galvstar—requested a meeting with Galvstar's management and representatives from Harvard. (*See* Pl. DSB Holdings, LLC's Mem. of Law in Opp'n to Def. Harvard Steel Sales LLC's Mot. for Summ. J. ("Mem. in Opp'n"), ECF No. 97 at 8.)

On April 25, 2013, Pynchon, Jacobs, and Greg Goad ("Goad")—Harvard's Chief Commercial Officer—held a meeting (the "April 25 Meeting"), to which Bain was not invited. (*Id.* at 8–9.) Plaintiffs were later informed by Goad that "Pynchon sought to enlist Jacobs in a takeover of Galvstar, driving out Bain," and that after the April 25 Meeting, Jacobs stated that he needed Harvard to get out of its agreement with Galvstar. (*Id.* at 10.) DSB acknowledges, however, that at the time, when Bain asked Jacobs what was discussed at the April 25 Meeting, Jacobs said it was about "business" and specifically noted that it did not relate to Galvstar. (*Id.*) Regardless, DSB assumes that the April 25 Meeting was the start of Defendants' (and others') scheme to cause Plaintiffs to rely on Defendants' financing so that Defendants could ultimately stop payments, cause Plaintiffs' business to fail, and replace Bain within Galvstar. (*See id.* at 9–10)

According to DSB, its relationship with Defendants—which prior to the April 25 Meeting, had been positive—quickly diminished. Specifically, prior to the April 25 Meeting, "Harvard had paid Galvstar within ten days of invoicing, including any non-prime material that Galvstar had processed for Harvard." (*Id.* at 15.) Moreover, "after speaking with Jacobs multiple times per day before the April 25 Meeting, Bain had trouble getting Jacobs on the phone even once a week." (*Id.* 15.) Despite Harvard's and Jacobs's continued reassurance that they were partners with Galvstar, DSB argues that Defendants' change in behavior demonstrates that they were part of a larger scheme to "cripple" Plaintiffs' business. (*Id.* at 15–16.)

3

During the first week of May 2013, Harvard began demanding that the TPA be signed. (*Id.* at 16.) DSB believes that despite claiming that he simply wanted to memorialize the terms of their agreement, Jacobs' insistence on an executed TPA was actually part of its scheme, as Defendants were attempting "to avoid any potential future claims by Galvstar related to steel Galvstar had previously processed for Harvard and related to Harvard's prior promises to process at least 5,000 tons per month through Galvstar." (*Id.* at 17.) DSB claims that this is evidenced by the fact that after executing the TPA, Harvard did not place a single order with Galvstar. (*Id.* at 2.)

Additionally, DSB points to various emails sent by Pynchon to individuals other than Defendants, wherein he discussed how he hoped and planned to take control of Galvstar. (*Id.* at 10–11.) DSB does not, however, assert with any evidence, that Defendants were aware of these communications. Notably, the only email involving Jacobs was on May 4, 2013, wherein Jacobs asked Pynchon to talk. (*Id.* at 12.) Jacobs has never stated—at his deposition or otherwise—that the discussion he wanted to have with Pynchon related to Pynchon's intention to take over Galvstar. DSB argues, however, that Jacob's evasive answers at his deposition demonstrates that whatever topics he planned to discuss with Pynchon must have related to the scheme. (*See id.* at 13.) DSB does not, in any substantive fashion, address the fact that Harvard's timeline summarizing the emails DSB references does not indicate anything nefarious happening at the time. (*See id.* at 12–14.)

Galvstar ultimately stopped production and, by early June 2013, terminated most of its employees. (Opp'n to Rule 56.1 Statement ¶ 84.) On June 18, 2013, Bain sent Harvard a formal demand for payment. (*Id.* ¶ 49.) Harvard did not pay the invoices sought by Galvstar. (*See* Mem. in Opp'n at 1, 21–22.) Galvstar shut down by September 2019. (Opp'n to Rule 56.1 Statement ¶ 33.)

4

Despite Harvard's assertion that it stopped making payments to and orders from Galvstar due to the poor quality of the steel it was producing, (*see* Mem. in Supp. at 5–9), DSB argues that this is simply "post-hoc justification for Harvard's breach of the covenant of good faith and fair dealing." (Mem. in Opp'n at 6–7.) For example, DSB points to the fact that Plaintiffs had already provided Defendants with a discount for non-performing steel. (*Id.* at 7.) It also alleges that it would have been unreasonable for Defendants to expect the steel to be of higher quality. For example, DSB asserts that Goad testified that the problems Galvstar was experiencing with the quality of its steel was typical for a start-up, and further, as Bain testified, when he attempted to get information from Harvard regarding the steel quality, "Jeremy Jacobs . . . did not give [him] any of this information. (*Id.* at 6–7.) Harvard, however, points to specific communications where Bain addressed the "outrageous" quality of the steel and Goad admitted that the steel quality was "NOT commercially acceptable." (*See* Mem. in Supp. at 6–7.) Harvard also asserts that it lost business due to the poor quality of the steel. (*See* Opp'n to Rule 56.1 Statement ¶ 39.) Moreover, and notably, DSB does not, at any point, argue that Defendants' conclusion that the steel was not of high quality was incorrect, but simply states that Defendants *should not have expected* higher quality steel.

DSB argues that this Court should essentially ignore Defendants' proffered evidence, focusing on the credibility of Defendants' witnesses, (*see, e.g.*, Mem. in Opp'n at 9–10, 13–15), without addressing the fact that its own inferences and accusations are not supported by any evidence. Indeed, DSB also does not address how sophisticated the alleged scheme would have to be, if one existed. Indeed, Defendants would have had to predict extremely specific occurrences out of their control—including, for example, that Plaintiffs would produce low-quality steel after the April 25 Meeting. Finally, DSB does not acknowledge the facts that (1) neither Harvard nor Pynchon

ever took over Galvstar, and (2) Bain and his father still own Galvstar. (Opp'n to Rule 56.1 Statement ¶ 72.)

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 248).

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, the opposing party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's

6

favor. *See id.* However, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (internal citations omitted). Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286.

### III. HARVARD HAS NOT BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING[2]

The implied covenant of good faith and fair dealing "encompasses the performance of 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" *DBT GMBH v. J.L. Mining Co.*, 544 F. Supp. 2d 364, 384 (S.D.N.Y. 2008) (quoting *Rowe v. Great Atl. & Pac. Tea Co., Inc.*, 46 N.Y.2d 62, 69 (1978)). "It also encompasses the obligation that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933)). "To prove a violation of the implied covenant of good faith and fair dealing, conclusory allegations of a party's failure to act in

---

[2] In addition to their argument that the record does not support a claim for breach of the implied covenant of good faith and fair dealing, Harvard argues that DSB does not have standing to bring this case. Specifically, Harvard asserts that Galvstar's assignment of its assets to DSB is champertous and therefore void under New York law. (*See* Mem. in Supp. 21–22.) New York's prohibition against champerty provides, in relevant part, that a corporation or association may not "solicit, buy or take an assignment of . . . any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon." N.Y. Judiciary Law § 489(1). The prohibition on champerty, however, "does not apply when the purpose of an assignment is the collection of a legitimate claim." *Trust for Certificate Holders of Merrill Lynch Mortg. Investors, Inc. v. Love Funding Corp.*, 591 F.3d 116, 121 (2d Cir. 2010). Based on the evidence currently in the record, DSB appears to be a wholly-owned entity of Bain, and it appears that Bain structured and created it solely to transfer funds and become a creditor of Galvstar. (Harvard's Rule 56.1 Statement ¶¶ 96–101.) While DSB disputes that it is simply a shell company, it argues that this issue is "not ripe for summary judgment," but that it will be ripe for trial. (*See* Mem. in Opp'n at 24–25; *see also* Tr. of Oral Arg. dated Jan. 28, 2020 ("Oral Arg. Tr."), ECF No. 99 at 47:21–49:21.) Specifically, DSB asserts that because Defendants did not previously ask Bain or others detailed questions regarding DSB's activity at his deposition, the Court should not conclude that this evidence does not exist, nor should it assume that it cannot be gathered before trial. (*See* Oral Arg. Tr. at 47:21–49:21.) Although a motion for summary judgment requires this Court to consider the record evidence, this Court recognizes that Plaintiffs may not have had the opportunity to collect evidence on this issue. Because this Court can resolve this case on alternative grounds, it need not reach a determination as to whether DSB's role as assignee and Plaintiff in this matter violates New York's restriction on champerty.

7

good faith alone are insufficient; specific factual allegations of a party's bad faith acts are required." *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007). Moreover, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243–44 (S.D.N.Y. 1997) (citation omitted). *See also Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).

DSB alleges that Defendants participated in a scheme to sabotage Plaintiffs and then take over their business. (*See generally* Am. Compl.) Harvard argues that the record contains "no evidence that Harvard participated in a 'scheme to take over Galvstar,' or otherwise act in bad faith." (Mem. in Supp. at 18 (quoting Summ. Order at 7).) For Harvard's summary judgment claim to fail, the record must contain evidence demonstrating that, at a minimum, there are facts—and not simply conclusory allegations—that support DSB's argument that Defendants did not intend to honor the TPA when they agreed to it. DSB asserts various facts on which it purports to rely in reaching the conclusion that Defendants signed the TPA as part of a scheme to injure Galvstar's business. *See* Mem. in Opp'n at 3–20.) No evidence in the record, however, even after the parties engaged in extensive discovery, would support a conclusion that Defendants entered into the contract as part of a scheme.[3] On the other hand, Defendants have now collected and offered evidence that directly cuts against DSB's allegations.

For example, DSB relies on the fact that at his deposition, Jacobs testified that "Harvard had an interest in owning equity in Galvstar and that part of the reason Harvard was negotiating with

---

[3] It is worth noting that when the Second Circuit remanded this claim to this Court, it stated that this Court's previous conclusion that this count should be dismissed "may hold true at the summary judgment stage." (Summ. Order at 7.) DSB has not demonstrated any evidence upon which its claims are based, and therefore, Harvard is entitled to summary judgment on this count.

8

Galvstar's creditors was to justify Galvstar giving Harvard that equity." (*See id.* at 5.) DSB also asserts various facts in what appears to be an attempt to demonstrate that it would not have been reasonable for Defendants to expect higher quality steel. The question of whether it would have been reasonable for Defendants to expect a higher quality of steel, however, is not the issue. Even if Defendants had unreasonable expectations, a reasonable trier of fact could not, relying on the record, make the leap that simply because it might not have been reasonable for Defendants to have different expectations for the quality of the steel, Harvard therefore must not have intended to honor the terms of the TPA.

DSB also alleges that in April 2013, Jacobs "unilaterally changed the price per ton Harvard was to pay Galvstar for processing steel from $70 per ton to $30-$50 per ton," and Jacobs "argued that a discount was necessary to account for non-performing steel." (*Id.* at 7.) Harvard, however, asserts that the discounts that Plaintiffs offered were insufficient to make up for the funds that it lost in total for the negative quality of steel. (*See* Mem. in Supp. at 9.) DSB also alleges that things began to change between the parties after the April 25 Meeting. (Mem. in Opp'n at 8–9.) As DSB itself acknowledges in its papers, however, Defendants have consistently stated that the discussions at the April 25 Meeting were not regarding any sort of scheme, (*see id.* at 8–9), and Plaintiff is unable to offer any evidence to the contrary.

The most probative fact that DSB alleges in support its conclusion is the claim that Goad allegedly told Bain that "Jacobs told Goad that Harvard had to get out of its agreement with Galvstar." (Decl. of Daniel Bain in Opp'n to Defs.' Mot. for Summ. J., ECF No. 97-2 ¶ 3.) This, however, even if true, does not support the conclusion that one month later, Defendants executed the TPA with Galvstar with the intention of harming Galvstar financially, *i.e.*, under a false pretense. Even coupling this with the entirety of the evidentiary record, DSB fails to demonstrate that

9

Defendants signed the TPA for the purpose of forwarding a scheme, or even that Defendants were part of a scheme. The facts, based on all of the evidence collected, does not support that DSB would be able to succeed on its claim at trial.

Similarly, in DSB's Opposition to Harvard's Rule 56.1 Statement, there is not a single fact—as opposed to conclusory allegation—that supports DSB's theory. (*See* Opp'n to Rule 56.1 Statement.) Indeed, DSB denies most of Harvard's Statement of Undisputed Material Facts, (*see* Harvard's Rule 56.1 Statement), by make passing statements and sweeping assertions, and focusing on non-material discrepancies such as, "Harvard at the time it demanded the TPA to be signed did not intend to honor the TPA," without any indication as to how the record supports such a conclusion. (*See, e.g.,* Opp'n to Rule 56.1 Statement ¶¶ 12–15.) Because DSB's claim is wholly reliant on conclusory allegations, and DSB is unable to counter with evidence any of Defendants' factual assertions, a reasonable jury could not find that DSB has successfully demonstrated that Defendants were engaged in a scheme at the time they agreed to the TPA. DSB's claim is therefore is unable to withstand Harvard's motion for summary judgment.

## IV.   CONCLUSION

Harvard's motion for summary judgment, (ECF No. 91), is GRANTED. The Clerk of Court is directed to close this motion accordingly.

Dated: New York, New York  
September 23, 2020

SO ORDERED.

*George B. Daniels* (signature)  
GEORGE B. DANIELS  
United States District Judge